UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

———

|  |  |  |
|---|---|---|
| DEBORA A. DAVIS-GORDY, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:11-cv-243 |
| | ) | |
| v. | ) | Honorable Joseph G. Scoville |
| | ) | |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | **OPINION** |
| Defendant. | ) | |
| | ) | |

This is a social security action brought under 42 U.S.C. §§ 405(g), 1383(c)(3) seeking

review of a final decision of the Commissioner of Social Security denying plaintiff's claims for

disability insurance benefits (DIB) and supplemental security income (SSI) benefits.  In November

2006, plaintiff filed her applications for benefits alleging a May 18, 2006 onset of disability.[1] (A.R.

128-39).  Her claims were denied on initial review.  On May 20, 2009, plaintiff received a hearing

before an administrative law judge (ALJ), at which she was represented by counsel.  (A.R. 38-83).

On July 16, 2009, the ALJ issued a decision finding that plaintiff was not disabled.  (A.R. 23-37).

The Appeals Council denied review on January 10, 2011 (A.R. 1-4), and the ALJ's decision became

the Commissioner's final decision.

———

[1]SSI benefits are not awarded retroactively for months prior to the application for benefits.
20 C.F.R. § 416.335;  *see Kelley v. Commissioner*, 566 F.3d 347, 349 n.5 (3d Cir. 2009); *see also
Newsom v. Social Security Admin.*, 100 F. App'x 502, 504 (6th Cir. 2004).  The earliest month in
which SSI benefits are payable is the month after the application for SSI benefits is filed.  Thus,
December 2006 is plaintiff's earliest possible entitlement to SSI benefits.

Plaintiff filed a timely complaint seeking judicial review of the Commissioner's decision. Pursuant to 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure, the parties voluntarily consented to have a United States magistrate judge conduct all further proceedings in this case, including entry of final judgment. (docket # 18). Plaintiff argues that the Commissioner's decision should be overturned on the following grounds:

A.    The ALJ's Decision was not based on substantial evidence because he failed to give proper weight to the findings and opinion of Plaintiff's treating physicians, as required by 20 C.F.R. § 404.1527(d).

    1.    He did not consider the statement of Dr. Cox.

    2.    The ALJ failed to give proper weight to Dr. Gandy's opinion.

    3.    The ALJ incorrectly disregarded the observations of Plaintiff's therapists and the physicians' assistants.

B.    The ALJ's Decision that Plaintiff did not meet Listing 12.04 is not supported by substantial evidence.

C.    The ALJ's Decision is not supported by substantial evidence because he failed to properly follow 20 C.F.R. § 416.929 and other rules and case law in assessing Plaintiff's credibility.

    1.    The Plaintiff's credibility is clearly supported by the medical evidence.

    2.    Plaintiff's activities of daily living (ADLs) are consistent with her alleged symptoms and pain.

D.    The ALJ's findings on Plaintiff's RFC and his finding that the Plaintiff can perform jobs existing in significant numbers in the regional economy are not supported by substantial evidence.

    1.    The ALJ failed to perform a function-by-function analysis as required by 20 C.F.R. § 404.1520a, SSR 98-6p and SSR 85-15.

    2.    The hypothetical given to the VE upon which the ALJ relied failed to include Plaintiff's well-documented impairments of record.

E.      The ALJ should have found Ms. Davis-Gordy fully credible and determined that she was disabled, consistent with the VE's testimony, including but not limited to, the number of days she would miss work.

(Statement of Errors, Plf. Brief at iii, docket # 21; *see also* Reply Brief at 5, docket # 25). The Commissioner's decision will be affirmed.

## <u>Standard of Review</u>

When reviewing the grant or denial of social security benefits, this court is to determine whether the Commissioner's findings are supported by substantial evidence and whether the Commissioner correctly applied the law. *See Elam ex rel. Golay v. Commissioner*, 348 F.3d 124, 125 (6th Cir. 2003); *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001). Substantial evidence is defined as "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Heston v. Commissioner*, 245 F.3d 528, 534 (6th Cir. 2001) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)); *see Rogers v. Commissioner*, 486 F.3d 234, 241 (6th Cir. 2007). The scope of the court's review is limited. *Buxton*, 246 F.3d at 772. The court does not review the evidence *de novo*, resolve conflicts in evidence, or make credibility determinations. *See Ulman v. Commissioner*, 693 F.3d 709, 713 (6th Cir. 2012); *Walters v. Commissioner*, 127 F.3d 525, 528 (6th Cir. 1997). "The findings of the [Commissioner] as to any fact if supported by substantial evidence shall be conclusive . . . ." 42 U.S.C. § 405(g); *see McClanahan v. Commissioner*, 474 F.3d 830, 833 (6th Cir. 2006). "The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion. . . . This is so because there is a 'zone of choice' within which the Commissioner can act without fear of court interference." *Buxton*, 246 F.3d at 772-73. "If supported by substantial evidence, the

[Commissioner's] determination must stand regardless of whether the reviewing court would resolve the issues of fact in dispute differently." *Bogle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993); *see Gayheart v. Commissioner*, 710 F.3d 365, 374 (6th Cir. Mar. 2013)("A reviewing court will affirm the Commissioner's decision if it is based on substantial evidence, even if substantial evidence would have supported the opposite conclusion."). "[T]he Commissioner's decision cannot be overturned if substantial evidence, or even a preponderance of the evidence supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Commissioner*, 336 F.3d 469, 477 (6th Cir. 2003); *see Kyle v. Commissioner*, 609 F.3d 847, 854 (6th Cir. 2010).

## Discussion

The ALJ found that plaintiff met the disability insured status requirements of the Social Security Act on May 18, 2006, her alleged onset of disability, and continued to meet the requirements through the date of the ALJ's decision.  (A.R. 25).  Plaintiff had not engaged in substantial gainful activity on or after May 18, 2006.  (A.R. 25).  The ALJ found that plaintiff had the following severe impairments:  "Bipolar Disorder, Degenerative Disc Disease, and Right Carpal Tunnel Syndrome."  (A.R. 25).  The ALJ found that plaintiff did not have an impairment or combination of impairments which met or equaled the requirements of the listing of impairments. (A.R. 26).  The ALJ found that plaintiff retained the residual functional capacity (RFC) for a limited range of  light work:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) with the following restrictions:  the claimant may only occasionally climb ramps and stairs, balance, stoop, crouch, crawl, and kneel and never climb ladders, ropes, and

-4-

scaffolds.  Due to the claimant's mental impairment, the claimant is limited to performing unskilled work.

(A.R. 31).  The ALJ determined that plaintiff's subjective complaints were not fully credible.  (A.R. 31-35).  The ALJ found that plaintiff was not disabled at step four of the sequential analysis[2] because she was capable of performing her past relevant work as lunch room attendant and crossing guard.  (A.R. 35-36).

The ALJ made an alternative finding that plaintiff was not disabled at step five of the sequential analysis.  Plaintiff was 44-years-old as of the date of her alleged onset of disability and 48-years-old as of the date of the ALJ's decision.  Thus, at all times relevant to her claims for DIB and SSI benefits, plaintiff was classified as a younger individual.  (A.R. 36).  Plaintiff has at least a high-school education and is able to communicate in English.  (A.R. 36).  The transferability of job skills was not material to a disability determination.  (A.R. 36).  The ALJ then turned to the testimony of a vocational expert (VE).  In response to a hypothetical question regarding a person of plaintiff's age, and with her RFC, education, and work experience, the VE testified that there were approximately 750,000 jobs in Michigan that the hypothetical person would be capable of

---

[2]"Administrative law judges employ a five-step sequential inquiry to determine whether a claimant is disabled within the meaning of the Social Security Act."  *Warner v. Commissioner*, 375 F.3d 387, 390 (6th Cir. 2004).  Under the sequential analysis, "The claimant must first show that she is not engaged in substantial gainful activity.  Next, the claimant must demonstrate that she has a 'severe impairment.'  A finding of 'disabled' will be made at the third step if the claimant can then demonstrate that her impairment meets the durational requirement and 'meets or equals a listed impairment.'  If the impairment does not meet or equal a listed impairment, the fourth step requires the claimant to prove that she is incapable of performing work that she has done in the past.  Finally, if the claimant's impairment is so severe as to preclude the performance of past work, then other factors, including age, education, past work experience, and residual functional capacity, must be considered to determine if other work can be performed.  The burden shifts to the Commissioner at this fifth step to establish the claimant's ability to do other work."  *White v. Commissioner*, 572 F.3d 272, 282 (6th Cir. 2009).

performing.  (A.R. 76-77).  The ALJ found that this constituted a significant number of jobs.  Using Rule 202.20 of the Medical-Vocational Guidelines as a framework, the ALJ held that plaintiff was not disabled.  (A.R. 36-37).

## 1.

Plaintiff argues that the Commissioner's decision should be overturned because the ALJ "did not consider the opinion of Dr. Salena Cox[],[3] which was entitled to controlling weight," and the ALJ "failed to give adequate weight to the Mental RFC submitted by Dr. [James] Gandy." (Plf. Brief at 14-16).  The court finds that Dr. Cox's opinions were not entitled to controlling weight, because plaintiff failed to present sufficient evidence to establish that she was a treating physician during the period at issue.  In addition, plaintiff's attorney's delay in presenting Cox's RFC questionnaire responses to the ALJ is the reason that no discussion of the questionnaire is found in the ALJ's opinion. Plaintiff has not attempted to satisfy her burden under sentence six of 42 U.S.C. 405(g) for an order remanding this matter to the Commissioner for consideration of new evidence.[4] Further, the court finds  that the ALJ correctly applied the law and that his finding regarding the weight given to Dr. Gandy's RFC questionnaire responses is supported by more than substantial evidence.

The issue of whether the claimant is disabled within the meaning of the Social Security Act is reserved to the Commissioner.  20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1); *see*

---

[3]Plaintiff's brief refers to this physician interchangeably as Dr. Cox or Dr. Cox-Johnson.  The shorter version of the physician's name is used in this opinion.

[4]Plaintiff's briefs leave no doubt that the only type of remand she is seeking is a post-judgment remand to the Commissioner "under the fourth sentence of 42 U.S.C. § 405(g)."  (Plf. Brief at 20; Reply Brief at 5).

*Warner v. Commissioner*, 375 F.3d 387, 390 (6th Cir. 2004).  A treating physician's opinion that a patient is disabled is not entitled to any special significance.  *See* 20 C.F.R. §§ 404.1527(d)(1), (3), 416.927(d)(1), (3); *Bass v. McMahon*, 499 F.3d 506, 511 (6th Cir. 2007); *Sims v. Commissioner*, 406 F. App'x 977, 980 n.1 (6th Cir. 2011) ("[T]he determination of disability [is] the prerogative of the Commissioner, not the treating physician.").  Likewise, "no special significance" is attached to treating physician opinions regarding the credibility of the plaintiff's subjective complaints, RFC, or whether the plaintiff's impairments meet or equal the requirements of a listed impairment because they are administrative issues reserved to the Commissioner.  20 C.F.R. §§ 404.1527(d)(2), (3), 416.927(d)(2), (3); *see Allen v. Commissioner*, 561 F.3d 646, 652 (6th Cir. 2009).

Generally, the medical opinions of treating physicians are given substantial, if not controlling deference.  *See Johnson v. Commissioner*, 652 F.3d 646, 651 (6th Cir. 2011).  "[T]he opinion of a treating physician does not receive controlling weight merely by virtue of the fact that it is from a treating physician.  Rather, it is accorded controlling weight where it is 'well supported by medically acceptable clinical and laboratory diagnostic techniques' and is not 'inconsistent . . . with the other substantial evidence in the case record.'"  *Massey v. Commissioner*, 409 F. App'x 917, 921 (6th Cir. 2011) (quoting *Blakley v. Commissioner*, 581 F.3d 399, 406 (6th Cir. 2009)).  A treating physician's opinion is not entitled to controlling weight where it is not "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and is "inconsistent with the other substantial evidence in [the] case record."  20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).  The ALJ "is not bound by conclusory statements of doctors, particularly where they are unsupported by detailed objective criteria and documentation."  *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001).  An opinion that is based on the claimant's reporting of her symptoms is not entitled to controlling

-7-

weight.  *See Young v. Secretary of Health & Human Servs.*, 925 F.2d 146, 151 (6th Cir. 1990); *see also Francis v. Commissioner*, 414 F. App'x 802, 804 (6th Cir. 2011) (A physician's statement that merely regurgitates a claimant's self-described symptoms "is not a medical opinion at all.").

Even when a treating source's medical opinion is not given controlling weight because it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with other substantial evidence in the record, the opinion should not necessarily be completely rejected; the weight to be given to the opinion is determined by a set of factors, including treatment relationship, supportability, consistency, specialization, and other factors.  *See Titles II and XVI: Giving Controlling Weight to Treating Source Medical Opinions*, SSR 96-2p (reprinted at 1996 WL 374188 (SSA July 2, 1996)); 20 C.F.R. §§ 404.1527(c), 416.927(c); *Martin v. Commissioner*, 170 F. App'x 369, 372 (6th Cir. 2006).

The Sixth Circuit has held that claimants are "entitled to receive good reasons for the weight accorded their treating sources independent of their substantive right to receive disability benefits."  *Smith v. Commissioner*, 482 F.3d 873, 875-76 (6th Cir. 2007); *see Cole v. Astrue*, 661 F.3d 931, 937-38 (6th Cir. 2011); *Wilson v. Commissioner*, 378 F.3d 541, 544 (6th Cir. 2004). "[T]he procedural requirement exists, in part, for claimants to understand why the administrative bureaucracy deems them not disabled when physicians are telling them that they are."  *Smith*, 482 F.3d at 876; *see Gayheart v. Commissioner*, 710 F.3d at 376.

A.    Dr. Cox

Plaintiff argues that the ALJ violated the treating physician rule by not considering the opinion of Dr. Cox:

> [T]he ALJ's <u>Decision</u> did not address Dr. Cox's statement.  Failure to address Dr. Cox's RFC [sic] is clear error.  She is a treating physician, and her opinion should be controlling.  The ALJ's finding that Plaintiff can perform light, unskilled work is inconsistent with Dr. Cox's findings.  The ALJ did not state any reason for rejecting her opinion.  Therefore, the ALJ's opinion is not based on substantial evidence and should be reversed.

(Plf. Brief at 14).  Plaintiff attempts to assume away a pivotal issue:  whether Dr. Cox was a treating physician.  Dr. Cox's status as a treating physician (whose opinion could be entitled to controlling weight and would be subject to the "good reasons" rule) must be determined on the basis of the medical records that plaintiff presented to the ALJ.   Dr. Cox saw plaintiff on only two occasions: April 16, 2009, and May 1, 2009.  On April 16, 2009, plaintiff reported that another medical provider had diagnosed her with fibromyalgia and prescribed Darvocet, but the Darvocet was not providing adequate pain relief.  (A.R. 751).  Dr. Cox gave plaintiff a prescription for Lyrica. (A.R. 752).  Plaintiff began taking Lyrica on April 19, 2009, and the next afternoon reported to Family Health Center staff that she was "feeling odd."[5]  (A.R. 767).  She was "not dizzy, but not herself."  (A.R. 767).  Dr. Cox advised staff to instruct plaintiff to continue taking Lyrica and to schedule an appointment if she continued to feel odd. (A.R. 766).  On April 30, 2009, plaintiff indicated that she continued to have problems with Lyrica. (A.R. 766).  On May 1, 2009, Dr. Cox reduced plaintiff's dose of Lyrica. (A.R. 750).  Plaintiff revealed that her fibromyalgia symptoms seemed better with Lyrica.  (A.R. 750).  Dr. Cox noted that she would consider changing plaintiff's prescription to Neurontin if plaintiff continued to experience problems on the lower dose of Lyrica.  (A.R. 750).  Plaintiff testified that Dr. Cox was a "new doctor for [her]."  (A.R. 50).  Plaintiff did not submit any other medical records from Dr. Cox in support of her claims for DIB and SSI benefits.

---

[5]Plaintiff saw other medical care providers at the Battle Creek Family Health Center.  The ALJ's opinion provides an accurate summary of the treatment plaintiff received for her "assorted ailments."  (A.R. 32-33).

The purpose of the "treating physician rule" is to give more weight to the medical opinions expressed by physicians who have had a long-term treatment relationship with the claimant. "[A] medical professional who has dealt with the claimant and [her] maladies over a long period of time will have a deeper insight into the medical condition of the claimant than will a person who has examined the claimant but once, or who has only seen the claimant's medical records." *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir.1994); *see Rogers v. Commissioner*, 486 F.3d 234, 242 (6th Cir.2007); *see also* 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). Social security regulations define a "treating source" as a physician or other acceptable medical source who has had an "ongoing treatment relationship" with the claimant:

> Treating source means your own physician, psychologist, or other acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you. Generally, we will consider that you have an ongoing treatment relationship with an acceptable medical source when the medical evidence establishes that you see, or have seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for your medical condition(s). . . . We will not consider an acceptable medical source to be your treating source if your relationship with the source is not based on your medical need for treatment or evaluation, but solely on your need to obtain a report in support of your claim for disability. In such a case, we will consider the acceptable medical source to be a nontreating source.

20 C.F.R. §§ 404.1502, 416.902; *see Coldiron v. Commissioner,* 391 F. App'x 435, 442 (6th Cir. 2010). It is well established that a single visit fails to establish an ongoing treatment relationship. *See Kornecky v. Commissioner*, 167 F. App'x 496, 506 (6th Cir.2006)(collecting cases). "Indeed, depending on the circumstances and the nature of the alleged condition, two or three visits often will not suffice for an ongoing treatment relationship." *Id.* at 506-07. The ALJ did not commit error on this record by a failure to accord Dr. Cox's opinions treating source status. Plaintiff failed to submit medical evidence sufficient to establish that Dr. Cox was a treating source. Because Cox was not

a treating source, the ALJ was "not [ ] under any special obligation to defer to her opinion[s] or to explain why he elected not to defer to [them]." *Karger v. Commissioner*, 414 F. App'x 739, 744 (6th Cir. 2011).

       The only other evidence from Dr. Cox is the RFC questionnaire she signed months after plaintiff's administrative hearing. (Exhibit 28F, A.R. 872-873). On May 20, 2009, plaintiff had her administrative hearing before the ALJ. (A.R. 40-83). Plaintiff's attorney expressed satisfaction with exhibits admitted in plaintiff's case. (A.R. 42). The record presented did not include any RFC questionnaire responses from Dr. Cox. Plaintiff's attorney did not make any request for the ALJ to keep the record open to allow him to file such an exhibit. (A.R. 82). "Where the transcript of a hearing before the ALJ clearly indicates that claimant's attorney did not seek to have the record remain open until such time as other evidence could be made a part of the record, suggests that the claimant considered the evidence before the ALJ to be complete and sufficient to support h[er] claim." *Collins v. Commissioner*, No. 10-15000, 2011 WL 6654467, at * 4 (E.D. Mich. Nov. 9, 2011) (collecting cases); *see Cranfield v. Commissioner*, 79 F. App'x 852, 859 (6th Cir. 2003) (Where a claimant fails to notify the ALJ that additional evidence will be forthcoming, fails to seek a continuance on that basis, and proceeds to a hearing without all her evidence, she "must live with the consequences.").

       The only RFC questionnaire mentioned during plaintiff's hearing was Dr. Gandy's. (A.R. 41-42). Nothing was said about Cox's questionnaire. (A.R. 40-82). Dr. Cox's signature is dated July 14, 2009, and the fax information on the completed RFC questionnaire suggests that she returned the form to plaintiff's attorney on July 14, 2009. (A.R. 872-73). Plaintiff has not established the exact date Dr. Cox's questionnaire responses were filed, but it could not have been

at any time before July 14, 2009.  (A.R. 873).  It appears that plaintiff's attorney electronically filed the questionnaire responses shortly before the ALJ entered his decision[6] and without the ALJ's knowledge of the exhibit's existence.  This type of sandbagging has consequences.

"The purpose of the hearing is to give the claimant an opportunity to present evidence.  Once concluded, ALJs have the option to reopen a hearing to receive new and material evidence, but are under no obligation to do so." *Willis v. Commissioner*, No. 10-cv-310, 2011 WL 4037032, at * 4 (S.D. Ill. Sept. 12, 2011) (citation omitted); *accord McClesky v. Astrue*, 606 F.3d 351, 355 (7th Cir. 2010) ("The decision whether to reopen the hearing . . . is discretionary.").  An ALJ does not abuse his discretion if he refuses to consider or fails to consider post-hearing evidence which is not accompanied by a request to reopen the hearing.[7]  *See Hurt v. Astrue*, No. 1:10-cv-353, 2011 WL 3682770, at * 6 (S.D. Ohio Aug. 23, 2011); *see also Hamilton v. Astrue*, No. 4:07-cv-117, 2008 WL 2705171, at * 7 (S.D. Ind. June 24, 2008) (Even if the ALJ received the records he "was not bound to include them in h[is] decision" because "[t]he records were submitted after the hearing, and the ALJ had discretion to reject them."); *accord Morgan v. Colvin*, No. CIV-12-625, 2013 WL 1742645, at * 5 n.11 (W.D. Okla. Apr. 1, 2013) ("Where, as here, Plaintiff was represented by

---

[6]This interpretation of the sequence of events is further reinforced by defendant's brief.  Defendant did not include Dr. Cox's questionnaire responses in the discussion of the evidence that plaintiff filed after the ALJ entered his decision.  (Def. Brief at 13, docket # 23).

[7]Even assuming the ALJ committed error in not discussing Cox's RFC questionnaire responses, the error would be harmless.  Dr. Cox offered her opinions regarding plaintiff's RFC as of July 14, 2009.  (A.R. 873).  At most, her questionnaire responses were relevant to plaintiff's RFC on only the last three days (July 14, 15, 16, 2009) out of the multi-year period at issue beginning on May 18, 2006, and ending on July 16, 2009.  In addition, Dr. Cox's questionnaire responses are conclusory and are not tied to any supporting medical evidence.  (A.R. 872-73).  Her statement that plaintiff would miss more than four days of work per month was conjecture, not a medical opinion.  *See Murray v. Commissioner*, 1:10-cv-297, 2011 WL 4346473, at * 7 (W.D. Mich. Aug. 25, 2011)(collecting cases).  Further, the issues of disability and RFC are reserved to the Commissioner. 20 C.F.R. §§ 404.1527(d), 416.927(d); *see Allen v. Commissioner*, 561 F.3d at 652.

counsel at the administrative hearing 'the ALJ should ordinarily be entitled to rely on the claimant's counsel to structure and present claimant's case in a way that the claimant's claims are adequately explored.'") (quoting *Hawkins v. Chater*, 113 F.3d 1162, 1167 (10th Cir. 1997)). Plaintiff never filed a request asking the ALJ to reopen the hearing for consideration of Dr. Cox's questionnaire responses. *See* 20 C.F.R. §§ 404.944, 416.1444. If plaintiff had filed a timely request to reopen the hearing, it would have alerted the ALJ to the presence of the RFC questionnaire. The error, if any, was the attorney's late submission of the RFC questionnaire responses. An ALJ does not abuse his discretion if he refuses to consider or fails to consider post-hearing evidence which is not accompanied by a request to reopen the hearing. *See Hurt v. Astrue*, 2011 WL 3682770, at * 6.

The court finds no basis for disturbing the Commissioner's decision.

B.     Dr. Gandy

Plaintiff argues that the ALJ should have given controlling weight to a mental RFC questionnaire signed by James Gandy, D.O., Helena M. Puhalj, P.A., and Michelle Oursler, LMSW. Plaintiff presents her argument in these terms:

> The ALJ did not give any weight to Dr. Gandy's statement, nor did he address that Plaintiff's recent therapist, Michelle Oursler, concurred in his conclusions. The ALJ stated that there was no narrative to support their "extreme limitations" and that the Plaintiff's GAF was frequently above 50. He denigrated her suicide attempt as a result of not taking her medication.

> The ALJ should have given full credibility to Dr. Gandy's Mental RFC. There are literally hundreds of pages of psychological records supporting Dr. Gandy's findings. The records show continued problems with emotional issues, anger, crying, sleeping and depression. Even if plaintiff's suicide attempt resulted from a lack of medication, she frequently was without insurance, had no income or limited income, and could not afford medication or therapy at times. Ms. Davis-Gordy had decreased GAF scores in 2008 after her suicide attempt. Scores of 51-60 have significant implications, which the ALJ ignored.

-13-

(Plf. Brief at 15). The court finds that Dr. Gandy's questionnaire answers were not entitled to controlling weight under the treating physician rule. The treating physician rule did not apply to the opinions of Ms. Oursler and Ms. Puhalj because social workers and physician's assistants are not "acceptable medical sources." *See* 20 C.F.R. §§ 404.1513(a), (d), 416.913(a), (d); *see also Payne v. Commissioner*, 402 F. App'x 109, 119 (6th Cir. 2010); *Geiner v. Astrue*, 298 F. App'x 105, 108 (2d Cir. 2008); *Hayes v. Commissioner*, No. 1:09-cv-1107, 2011 WL 2633945, at * 6 (W.D. Mich. June 15, 2011). Only "acceptable medical sources" can: (1) provide evidence establishing the existence of a medically determinable impairment; (2) provide a medical opinion; and (3) be considered a treating source whose medical opinion could be entitled to controlling weight under the treating physician rule. *See Titles II and XVI: Considering Opinions and Other Evidence from Sources Who are not 'Acceptable Medical Sources' in Disability Claims; Considering Decisions on Disability by Other Governmental and Nongovernmental Agencies*, SSR 06-3p (reprinted at 2006 WL 2329939, at * 2 (SSA Aug. 9, 2006)). The opinions of physician's assistants and social workers fall within the category of information provided by "other sources." *Id.* at * 2; *see* 20 C.F.R. §§ 404.1513(d), 416.913(d). The social security regulations require that information from other sources be "considered." 2006 WL 2329939, at * 1, 4 (citing 20 C.F.R. §§ 404.1512, .1527, 416.912, .927); *see Cole v. Astrue*, 661 F.3d 931, 939 (6th Cir. 2011); *Cruse v. Commissioner*, 502 F.3d 532, 541 (6th Cir. 2007) (citing 20 C.F.R. §§ 404.1512, 416.912). This is not a demanding standard. It was easily met here.

Plaintiff claimed a May 18, 2006 onset of disability. Her first contact with Dr. Gandy did not occur until June 3, 2007, and the last record of any treatment by Dr. Gandy is dated June 5,

-14-

2007.  By contrast, Anoop Thakur, M.D., a licensed psychiatrist, was plaintiff's treating psychiatrist before and during most of the period at issue.

On February 1, 2006, plaintiff advised Dr. Thakur that she had filed for bankruptcy a week earlier.  Dr. Thakur offered a diagnosis of major depression, recurrent, chronic, moderate, and prescribed Cymbalta and Lamictal.  (A.R. 738).  On March 16, 2006, plaintiff reported that her mood had improved on these medications.  (A.R. 734).  On May 4, 2006, plaintiff reported that she was "doing well."  (A.R. 731).  Plaintiff was angry that her employer had denied her disability claim and she reported that she was spending excessively:

> She felt everything was closing on to her.  She was disapproved for a disability claim and she felt extremely irritated by it.  She is still angry about the decision.  She has trouble sleeping.  She has been experiencing financial hardship and as a result had to borrow money from her mother.  She has also applied for unemployment.  Lately, she has been spending excessively and definitely believes that it is a presentation of her coping with her anxiety and anger.

(A.R. 731).  Dr. Thakur offered a diagnosis of a major depressive disorder, chronic, in partial remission.  (A.R. 731).

On May 31, 2006, Dr. Thakur offered a diagnosis of a major depressive disorder, chronic, mild.  He continued plaintiff's prescriptions for Cymbalta and Lamictal and added a prescription for "Ativan 0.5 mg. at bedtime."  (A.R. 728).  On June 26, 2006, plaintiff reported to Dr. Thakur that she was nervous about going back to work.  (A.R. 726).  On July 21, 2006, plaintiff reported that she had been feeling anxious and tearful.  She reported that she felt suicidal.  Dr. Thakur described plaintiff's depression during this period as "moderate to severe."  (A.R. 724).  Dr. Thakur adjusted plaintiff's prescriptions for Abilify and Lamictal and kept plaintiff off work for four weeks.  (A.R. 724).

On August 10, 2006, plaintiff reported to Dr. Thakur that her mood had improved. She was sleeping well, but her energy was still low.  Plaintiff stated that she was ready to try to work before August 21, 2006.  She stated that she was courting her boyfriend and planned to live with him in the near future.  "They both go out for long walks." (A.R. 723).  Dr. Thakur gave plaintiff a GAF score[8] of 60.  (A.R. 723).

In September 2006, plaintiff was involved in an ongoing child custody dispute with her ex-husband.  (A.R. 307-09, 424).  On September 14, 2006, plaintiff described multiple somatic complaints.  She reported that she was running low on funds, was two months behind in making her rent payments, and had received an eviction notice.  Dr. Thakur noted that plaintiff's boyfriend was working and that plaintiff planned to live with him and split the expenses.  (A.R. 719).

On September 21, 2006, Judge Allen L. Garbrecht of the Family Division of the Calhoun County Circuit Court entered an order regarding parenting time and counseling.  (A.R. 307-

---

[8]GAF scores are subjective rather than objective assessments and are not entitled to any particular weight.  *See Kornecky v. Commissioner*, 167 F. App'x 496, 511 (6th Cir. 2006).  "GAF examinations measure psychological, social, and occupational functioning on a continuum of mental-health status from 0 to 100, with lower scores indicating more severe mental limitations." *White v. Commissioner*, 572 F.3d 272, 276 (6th Cir. 2009).  "GAF is a clinician's subjective rating of an individual's overall psychological functioning.  A GAF score may help an ALJ assess mental RFC, but it is not raw medical data.  Rather, it allows a mental health professional to turn medical signs and symptoms into a general assessment, understandable by a lay person, of an individual's mental functioning." *Kennedy v. Astrue*, 247 F. App'x 761, 766 (6th Cir. 2007); *see Kornecky*, 167 F. App'x at 503 n.7.  The DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS' (DSM-IV's) explanation of GAF scale indicates that "a score may have little or no bearing on the subject's social and occupational functioning."  *Kornecky*, 167 F. App'x at 511; *see Oliver v. Commissioner*, 415 F. App'x 681, 684 (6th Cir. 2011).  "Significantly, the SSA has refused to endorse the use of the GAF scale."  *Bennett v. Commissioner*, No. 1:07-cv-1005, 2011 WL 1230526, at * 3 (W.D. Mich. Mar. 31, 2011).  GAF scores "have no direct correlation to the severity requirements of the mental disorder listings." *DeBoard v. Social Security Admin.*, 211 F. App'x 411, 415 (6th Cir. 2006).

09).  Among other things, Judge Garbrecht ordered plaintiff and Mark Gordy to "return to counseling with the minor child to address the issues that are present."  (A.R. 308).

Plaintiff testified that she last worked in October of 2006.  She stated that she had experienced "several crying jags a day" and was not able to stay at her assigned machine.  She was placed on medical leave, and after she failed to return for a full year, her employment was terminated.  (A.R. 46).  She was placed on short-term disability through her employer.  (A.R. 46, *see* A.R. 318-19).

On November 8, 2006, plaintiff reported that she was feeling down with the seasonal changes and holidays.  She voiced multiple psychological stressors involving actions by her children and her mother's upcoming cardiac catheterization procedure.  (A.R. 716).  Dr. Thakur increased plaintiff's dose of Cymbalta, Lamictal, and Abilify.  (A.R. 716).  On November 16, 2006, plaintiff was angry because her ex-husband was taking her to court again.  (A.R. 715).  On December 6, 2006, plaintiff appeared at the emergency room complaining of chest pains.  Her test results were normal.  (A.R. 347-55).

On January 29, 2007, plaintiff was examined by David Newcomb, M.D., on a referral from Michigan's Family Independence Agency.  Plaintiff stated that she had smoked cigarettes on a daily basis for thirty years.  She was pleasant and cooperative throughout the examination.  Her gait was normal.  She had a full range of motion in her extremities.  Her hands had full dexterity and her grip strength was unimpaired.  Straight leg raising tests were negative and she displayed no paravertebral muscle spasm.  Her motor strength was 5/5.  Plaintiff displayed multiple trigger points on physical examination.  She had no neurological deficits.  (A.R. 314-16).

On January 31, 2007, Dr. Thakur noted that plaintiff's 21-year-old daughter and her two children had moved in with plaintiff because the daughter was divorcing her husband.  Plaintiff was extremely upset and angry with her daughter.  Her affect was appropriate and her judgment and insight were fair.  (A.R. 710).  On May 16, 2007, plaintiff noted that she was able to drive.  She continued to try to get her daughter out and her mother continued to threaten her.  Plaintiff's depression remained manageable.  (A.R. 704).

On February 10, 2007, Psychologist Timothy Strang conducted a mental status examination on a referral from Michigan's Disability Determination Service.  Plaintiff stated that she had been on short-term disability from Campbell Soup Company since October 2006.  (A.R. 318).  She identified Dr. Thakur as her treating psychiatrist and Dr. Dell as her primary care physician.  (A.R. 318).  Plaintiff stated that she smoked less than a pack of cigarettes per day.  She stated that she graduated from high school in the regular curriculum and that her grades were fair.  She was articulate, spontaneous, and well organized.  Her speech was understandable and she showed no signs of a thought disorder.  She was oriented in all three spheres.  Psychologist Strang offered a diagnosis of nicotine dependence and bipolar disorder, most recent episode depressed.  (A.R. 318-21).

On February 13, 2007, a physician's assistant at Dell Family Medicine offered his opinion that plaintiff's neck and lower back pain would limit her to no more than 2 hours each of sitting, standing, and walking.  He indicated that he would limit plaintiff to lifting weights no greater than 25 pounds.  He observed that plaintiff had no difficulty communicating with others and no deficits in remembering and carrying out instructions.  He noted that plaintiff's bipolar disorder was "very well controlled with medication."  (A.R. 324).

On February 20, 2007, Muhammad Khalid, M.D., reviewed plaintiff's medical records and offered his opinion that plaintiff could occasionally lift 20 pounds and frequently lift 10 pounds.  Plaintiff could stand and/or walk for 6 hours in an 8-hour workday.  She could sit for 6 hours in an 8-hour workday.  Dr. Khalid noted that plaintiff had no problems with her personal care. Plaintiff drove a car, shopped for food, cleaned the house, and took care of the laundry.  (A.R. 368-75).

On February 21, 2007, Weicher VanHouten, M.D., reviewed plaintiff's records and completed a psychiatric review technique form.  He found that plaintiff had the affective disorder of bipolar syndrome.  He found that plaintiff's mental impairment resulted in mild restriction of activities of daily living, mild difficulties maintaining social functioning, and no episodes of decompensation.  (A.R. 377-90).  Dr. VanHouten offered his opinion that plaintiff was "moderately limited" in her ability to understand, remember, and carry out detailed instructions and to maintain attention and concentration for extended periods.  (A.R. 391).

On June 2, 2007, plaintiff was admitted at Battle Creek Health System after a suicide attempt following an argument with her mother over finances and her live-in boyfriend's failure to make a financial contribution towards the housing expenses and his use of marijuana:

> Most of the history was obtained from the mother as the patient was drowsy.  Mother reports that the patient had been having a lot of difficulties specifically financial over the past several months.  She has stopped taking her medications.  She used to see a psychiatrist at Marshall. Currently, she is involved with a male who is not helping with the finances.  She lives at her home [and] the patient's mother is paying for the rent.  She has a 21-year-old daughter living with her besides her two grandchildren and also a 12-year-old son.  Mother reports several heated conversation[s] with the daughter regarding the patient's boyfriend who is living in the house without helping her with the finances.  She reports this boyfriend is smoking marijuana and she tried several times to get him out of the house with no success.

-19-

(A.R. 237).  Plaintiff was treated for an overdose of Abilify and Ativan.  (A.R. 239).  She was alert and cooperative, but somewhat sleepy.  (A.R. 238).  On June 3, 2007, plaintiff stated that she had felt overwhelmed by her financial difficulties and family conflicts.  (A.R. 239).  Plaintiff stated that her boyfriend provided positive emotional support.  He did not contribute financially because he had existing child support obligations.  (A.R. 460).  Plaintiff related that she had not seen Dr. Thakur or taken her medication for several months.  (A.R. 239, 778).  Plaintiff appeared to be "quite somatically focused."  There was no evidence of psychosis.  Plaintiff suffered no residual cognitive deficits as a result of her overdose.  (A.R. 240).

Plaintiff received a brief course of treatment by Dr. Gandy during the three-day period immediately after her discharge from the hospital: June 3, 2007, through June 5, 2007.  Plaintiff had a cooperative attitude.  Her affect was relatively broad with intermittent tearfulness. Her thought process was organized and goal-directed.  There was no evidence of psychosis and no evidence of cognitive deficits from her overdose. (A.R. 773).  Dr. Gandy began treating plaintiff with Cymbalta. (A.R. 844).  Plaintiff expressed a tremendous sense of relief when her daughter indicated that she would be moving out of the apartment and taking her children with her.  On June 5, 2007, plaintiff was deemed stable and was discharged.  Plaintiff had no physical or dietary restrictions.  (A.R. 239, 773).  Plaintiff reported to Dr. Gandy that it was very stressful living with her son, adult daughter and two grandchildren in an apartment.  (A.R. 778).  Plaintiff indicated that she felt overwhelmed with family stressors.  (A.R. 778).  Dr. Gandy gave plaintiff a GAF score at discharge of 40.  (A.R. 240, 779).

On July 5, 2007, a therapist in Dr. Thakur's office noted that plaintiff had moved out of the apartment and into a house without her daughter.  Her symptoms were manageable and her sleep had improved.  (A.R. 703).

On September 12, 2007, plaintiff advised Payton Brown, M.D., that she was going to be evicted from her apartment because she spent money on her car rather than her rent.  She stated that she had a fight with her boyfriend that morning.  Dr. Brown indicated that plaintiff appeared to have bipolar disorder and he began treating her with the mood stabilizer Topamax.  (A.R. 547-48). On December 12, 2007, Dr. Brown made the following observations regarding plaintiff: "Overweight, short, [] female.  No bizarre or unusual mannerisms.  Logical.  Not hallucinating.  Not delusional.  Not experiencing severe depression.  No danger to self or others."  (A.R. 527).  Dr. Brown stated that plaintiff's bipolar disorder was "well controlled on Lexapro, Cymbalta, and Lamictal."  (A.R. 527).

On March 5, 2008, Physician's Assistant Puhalj conducted a medication review with plaintiff.  Plaintiff had "normal" muscle strength and tone, gait, speech, pain, thought process, judgment, orientation, fund of knowledge, recent and remote memory, attention span and concentration, language, mood and affect, sleep, and appetite.  Plaintiff denied racing thoughts or thoughts of homicide or suicide.  Plaintiff was casually dressed and her grooming and hygiene were good.  Ms. Puhalj refilled plaintiff's prescriptions for Lexapro, Carbamazepine, and Cymbalta.  (A.R. 505).  On June 4, 2008, Ms. Puhalj made essentially the same normal findings.  The only abnormal finding  related to plaintiff's mood and affect.  Plaintiff reported that she continued to have "money problems" and that she was "still irritable at times."  (A.R. 657).

On June 25, 2008, plaintiff began seeing Social Worker Oursler.  (A.R. 651-52).  In July 2008, plaintiff reported anxiety regarding her daughter's parenting skills.  (A.R. 641, 648-49). On September 9, 2008, plaintiff informed Ms. Oursler that she was concerned about her daughter's lifestyle.  She expressed concern that her daughter's boyfriend could be operating a methamphetamine laboratory out of her daughter's house.  (A.R. 632).  In October 2008, plaintiff reported feeling overwhelmed at the prospect of packing up and moving from her apartment.  (A.R. 629).  In November 2008, she complained of stress related to moving to her new home.  (A.R. 628). On December 10, 2008, plaintiff reported to Ms. Oursler that a week earlier she had experienced a panic attack and went to the emergency room.  (A.R. 626).  The emergency room records showed that plaintiff continued to smoke cigarettes.  Her neurological examination was within normal limits. A battery of objective tests failed to uncover any cause for plaintiff's complaints.  In the absence of an objective cause, the emergency room physician attributed plaintiff's complaints to an anxiety attack and advised her to use the Xanax that she already had at home.  (A.R. 681-94).

On December 11, 2008, Ms. Puhalj conducted a medication review.  She made all the same normal findings as before, but she characterized plaintiff's judgment as fair.  Plaintiff continued to have money problems and stated that she was irritable and angry.  (A.R. 624).  On January 6, 2009, plaintiff reported that she was "doing ok on medication."  Ms. Puhalj's assessment generally remained unchanged.  Plaintiff's judgment was fair, her mood and affect was irritable, and Ms. Puhalj added a notation that plaintiff was having difficulty maintaining sleep.  In all other categories, plaintiff was "normal."  (A.R. 616).

On January 6, 2009, Ms. Puhalj completed a Michigan Department of Human Services form.  (A.R. 676).  She offered her opinion that plaintiff could not work at any job because

-22-

she had a mood disorder and a major depressive disorder.  In addition to her own signature, Ms.

Puhalj added Dr. Gandy's name in the box for the medical provider's signature.  (A.R. 676).

On February 11, 2009, plaintiff reported that she was trying to follow a recommended

diet.  She stated that she was spending more time providing care for her grandchildren than she

wanted because her daughter was not looking into other daycare options.  (A.R. 764).

On April 27, 2009, Dr. Thakur discharged plaintiff as a patient.  Her progress with

treatment had been fair.  (A.R. 701).  Plaintiff's treating psychiatrist gave a discharge diagnosis of

a major depressive disorder, recurrent, chronic, mild.  (A.R. 701).

On May 19, 2009, Ms. Puhalj completed, and she and Dr. Gandy signed, a "Mental

Impairment Questionnaire."  (A.R. 862-66).  Ms. Oursler signed the same questionnaire on July 7,

2009.  (A.R. 871).  The RFC questionnaire responses asserted that plaintiff was "seriously limited"

or  "unable to meet competitive standards" in every category listed.  (A.R. 863-64).  The responses

further offered opinions that plaintiff met the paragraph B and C requirements of Listing 12.04 and

that she would likely miss four or more days per month of work.  (A.R. 864-66).

On May 20, 2009, plaintiff's attorney told the ALJ that Physician's Assistant Puhalj

had signed the above-referenced RFC questionnaire because she "sees the claimant more frequently

than Dr. Gandy."  (A.R. 42).  Plaintiff's attorney argued that the RFC questionnaire responses should

receive controlling weight.  (A.R. 43).  Plaintiff testified that she had sessions with a "talk therapist"

once every two weeks for an hour.  (A.R. 59).  She saw Ms. Puhalj once every six months for thirty

minutes.  (A.R. 60).  The ALJ found that the RFC questionnaire responses were entitled to little

weight:

> The record contained two medical opinions from the claimant's primary treating sources
> which indicated the claimant would be unable to work due to her mental impairments.  (see

Ex. 21F and 26F) James Gandy, D.O., and Helena M. Puhalj, PAC, completed a fill in the blank form for the State of Michigan Department of Human Services on January 6, 2009, which indicated the claimant could not work due to mood disorder and major depressive disorder.  (see Ex. 21F)  The form indicated the claimant has office visits once per quarter and that it was unknown when the claimant would be able to return to work.  (*Id.*)  On May 19, 2008, Dr. Gandy and Ms. Puhalj completed a "fill-in-the-blank" assessment of the claimant's mental residual functional capacity.  (see Ex. 26F)  They indicated the claimant had moderate recurrent bipolar disorder and that her mood is improving with her current prescription medications.  (*Id.* p.1)  The form indicated that the claimant was either seriously limited or unable to meet competitive standards in every category of functioning analyzed. (*Id*. p.2-3)  Dr. Gandy and Ms. Puhalj also concluded the claimant had marked limitations in her activities of daily living, extreme difficulties in her ability to maintain social functioning, and marked difficulty in her ability to maintain concentration, persistence, or pace.  (*Id.* p.3)  There appeared to be some disagreement as to how may episodes of decompensation the claimant experienced as boxes were checked which indicated one or two, three, and four or more.  (*Id.* p.3)  When evaluating the severity of the claimant's mental impairment and in assessing her residual functional capacity for work-related activities, the undersigned gave little weight to the opinions of Dr. Gandy and Ms. Puhalj, since their reports failed to include any narrative to support their extreme limitations.  Their conclusions were also generally inconsistent with the claimant's treatment notes which indicated her mental status examinations were generally unremarkable and that her GAF was frequently assessed above 50.  The medical evidence did indicate the claimant attempted to suicide and that she received treatment for it.  However, the claimant's suicide attempt was noted to have occurred after the claimant failed to take her prescription medications for over a month.  The medical evidence of record indicated that when the claimant is compliant with taking her medication, she is capable of performing work with the restrictions noted below.[9]

(A.R. 29-30).  The court finds that the ALJ complied with the treating physician rule in the weight he gave to Dr. Gandy's RFC questionnaire responses and that he gave appropriate consideration to the opinions of the "other sources" who provided opinions regarding plaintiff's RFC.

---

[9]The Social Security regulations make pellucid that the claimant bears the burden of demonstrating "good reason" for her failure to follow prescribed treatment:  "If you do not follow the prescribed treatment without good reason, we will not find you disabled."  20 C.F.R. §§ 404.1530(b), 416.930(b).

-24-

**2.**

Plaintiff argues that the ALJ's finding that she did not meet the requirements of listing 12.04 is not supported by substantial evidence.  (Plf. Brief at 16-17).  It is well established that a claimant must show that she satisfies all the individual requirements of a listing.  *See Elam*, 348 F.3d at 125.  The listing must be read as a whole, and plaintiff had the burden of demonstrating that she met all parts of the listing.  "If all the requirements of the listing are not present, the claimant does not satisfy that listing."  *Berry v. Commissioner*, 34 F. App'x 202, 203 (6th Cir. 2002).  "It is insufficient that a claimant comes close to satisfying the requirements of a listed impairment." *Elam*, 348 F.3d at 125.

Listings for mental impairments generally begin with paragraph A criteria – statement describing the disorder addressed by the listing (a set of medical findings) – followed by the paragraph B criteria – a set of impairment-related functional limitations.  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00.  Listing 12.04 is one of four mental impairment listings containing paragraph C criteria (a second set of impairment-related functional limitations).  *Id*. "The requirements in paragraphs B and C describe impairment related functional limitations that are incompatible with the ability to do any gainful activity."  *Id*.  A claimant meets the requirement of the listing for affective disorders "when the requirements in both A and B are satisfied, or when the requirements in C are satisfied."  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04.  Plaintiff has been diagnosed with an affective disorder, and it is assumed for present purposes that she met the part A criteria.

Paragraph B requires that an affective disorder result in at least two of the following:

1.      Marked[10] restriction of activities of daily living; or

2.      Marked difficulties in maintaining social functioning; or

3.      Marked difficulties in maintaining concentration, persistence, or pace; or

4.      Repeated episodes of decompensation, each of extended duration;[11]

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04(B); *Rabbers v. Commissioner*, 582 F.3d at 658. The ALJ found that plaintiff did not meet or equal the paragraph B requirements because she had mild restriction in daily activities, mild difficulties in social functioning, moderate difficulties with concentration, persistence or pace, and no more than one or two episodes of decompensation. (A.R. 30).

      Plaintiff argues that she had "at least one episode of decompensation." (Plf. Brief at 16). The listing requires "repeated" episodes of decompensation, each of extended duration. Plaintiff argues that she had marked difficulties in social functioning. (*Id.*). Even assuming that she had marked restrictions in social functioning, she would fall short of satisfying the paragraph B requirements of the listing. A claimant must satisfy at least two of the requirements of paragraph B. *See Rabbers v. Commissioner*, 582 F.3d at 653. Further, plaintiff never seriously engages the ALJ's paragraph B findings and the evidence supporting those findings. It is not sufficient to point to evidence on which the ALJ could have based different findings. It is plaintiff's burden to show

---

[10]A "marked" limitation is a degree of limitation that is more than moderate, but less than extreme. 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(C); *see Sullenger v. Commissioner*, 255 F. App'x 988, 993 (6th Cir. 2007).

[11]"The term repeated episodes of decompensation, each of extended duration ... means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(C)(4); *see Rabbers v. Commissioner*, 582 F.3d 647, 659 (6th Cir. 2009).

that the ALJ's findings are unsupported by substantial evidence, not that there is evidence from which the ALJ could have reached the opposite conclusion. *Jones v. Commissioner*, 336 F.3d at 477; *see Kyle v. Commissioner*, 609 F.3d at 854. The ALJ's factual findings that plaintiff had mild restriction in daily activities, mild difficulties in social functioning, moderate difficulties with concentration, persistence or pace, and no more than one or two episodes of decompensation are supported by substantial evidence. (A.R. 26-31).

Paragraph C of listing 12.04 contains the following severity requirements:

C. Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:

1. Repeated episodes of decompensation, each of extended duration; or

2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or

3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R. Part 404, Subpt. P, App. 1, § 12.04(C). The ALJ found that the evidence plaintiff presented "fail[ed] to establish the presence of the 'paragraph C' criteria for listing 12.04." (A.R. 30). The ALJ's finding in this regard is supported by more than substantial evidence. (A.R. 26-31).

**3.**

Plaintiff argues that the ALJ failed to properly determine her credibility. (Plf. Brief at 17-18). Credibility determinations concerning a claimant's subjective complaints are peculiarly within the province of the ALJ. *See Gooch v. Secretary of Health & Human Servs.*, 833 F.2d 589, 592 (6th Cir. 1987). It is the ALJ's function to determine credibility issues. *See Siterlet v. Secretary*

*of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987).  The court does not make its own credibility determinations.  *See Walters v. Commissioner*, 127 F.3d 525, 528 (6th Cir. 1997).  The court's "review of a decision of the Commissioner of Social Security, made through an administrative law judge, is extremely circumscribed . . . ." *Kuhn v. Commissioner*, 124 F. App'x 943, 945 (6th Cir. 2005).  The Commissioner's determination regarding the credibility of a claimant's subjective complaints is reviewed under the "substantial evidence" standard.  This is a "highly deferential standard of review." *Ulman v. Commissioner*, 693 F.3d 709, 714 (6th Cir. 2012).  "Claimants challenging the ALJ's credibility determination face an uphill battle." *Daniels v. Commissioner*, 152 F. App'x 485, 488 (6th Cir. 2005).  "Upon review, [the court must] accord to the ALJ's determinations of credibility great weight and deference particularly since the ALJ has the opportunity, which [the court] d[oes] not, of observing a witness's demeanor while testifying." *Jones*, 336 F.3d at 476.  "The ALJ's findings as to a claimant's credibility are entitled to deference, because of the ALJ's unique opportunity to observe the claimant and judge her subjective complaints." *Buxton v. Halter*, 246 F.3d at 773; *accord White v. Commissioner*, 572 F.3d 272, 287 (6th Cir. 2009); *Casey v. Secretary of Health & Human Servs.*, 987 F.2d 1230, 1234 (6th Cir. 1993).

The ALJ gave a lengthy and detailed explanation why he found that plaintiff's testimony regarding her subjective functional limitations was not fully credible.  (A.R. 31-35).  The ALJ's factual finding is supported by more than substantial evidence.

### 4.

Plaintiff argues that the ALJ's findings regarding her RFC and her ability to perform a significant number of jobs in the regional economy are not supported by substantial evidence.  (Plf. Brief at 18-20).  RFC is the most, not the least, a claimant can do despite her impairments.  20 C.F.R.

§§ 404.1545(a)(1), 416.945(a)(1); *see Kornecky v. Commissioner*, 167 F. App'x 496, 499 (6th Cir. 2006).  RFC is an administrative finding of fact reserved to the Commissioner.  20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); *see Deaton v. Commissioner*, 315 F. App'x 595, 598 (6th Cir. 2009).  "In formulating a residual functional capacity, the ALJ evaluates all the relevant medical and other evidence and considers what weight to assign to treating, consultative, and examining physicians' opinions." *Eslinger v. Commissioner*, 476 F. App'x 618, 621 (6th Cir. 2012).  The ALJ's factual finding that plaintiff retained the RFC to perform a limited range of light, unskilled work is supported by more than substantial evidence.

Plaintiff's challenge to the adequacy of the hypothetical question posed to the VE does not undermine the ALJ's decision.  The ALJ did not rely on the hypothetical and response when he found that plaintiff was not disabled at step 4 of the sequential analysis.  Further, plaintiff's challenge to the ALJ's alternative finding at step 5 of the sequential analysis based on perceived inadequacies in the hypothetical question is a mere reformulation of her unsuccessful challenge to the ALJ's credibility determination.  The ALJ found that plaintiff's subjective complaints were not fully credible.  It is well settled that a hypothetical question to a VE need not include unsubstantiated limitations.  *See Carrelli v. Commissioner*, 390 F. App'x 429, 438 (6th Cir. 2010); *Gant v. Commissioner*, 372 F. App'x 582, 585 (6th Cir. 2010) ("[I]n formulating a hypothetical question, an ALJ is only required to incorporate those limitations which he has deemed credible.").  The ALJ's hypothetical question included all the limitations he found to be credible.

## <u>Conclusion</u>

For the reasons set forth herein, the Commissioner's decision will be affirmed.


Dated:   September 30, 2013        /s/  Joseph G. Scoville_____
                                   United States Magistrate Judge